UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

GARY KROMER, MONIQUE KROMER, JOSEPH AMMIRATI, MICHELLE AMMIRATI, on behalf of themselves and those similarly situated,

Plaintiffs,

—v—

FIDELITY NATIONAL TITLE INSURANCE CO., CHICAGO TITLE INSURANCE CO., TICOR TITLE INSURANCE CO., FIDELITY NATIONAL FINANCE, INC., FIRST AMERICAN TITLE INSURANCE CO. OF NEW YORK, UNITED GENERAL TITLE INSURANCE CO., FIRST AMERICAN CORP., COMMONWEALTH LAND TITLE INSURANCE CO., LAWYERS TITLE INSURANCE CORP., LANDAMERICA FINANCIAL GROUP, INC., STEWART TITLE INSURANCE CO., MONROE TITLE INSURANCE CORP., STEWART INFORMATION SERVICE CORP., AND TITLE INSURANCE RATE SERVICE ASSOCIATION, INC.,

Defendants.

---



08 Civ. _____

**08 CIV. 1494**

**CLASS ACTION COMPLAINT AND JURY DEMAND**

---

Plaintiffs Gary Kromer, Monique Kromer, Joseph Ammirati, and Michelle Ammirati (collectively, "Plaintiffs") on behalf of themselves and those similarly situated, upon knowledge with respect to their own acts and upon information and belief with respect to all other matters, allege as follows:

## SUMMARY OF CLAIM

1.      This case involves an illegal price-fixing agreement to collectively set the rates that New York consumers pay for title insurance and kickbacks and other payments prohibited by the Real Estate Settlement Procedures Act of 1974.  Since 1991 Defendants have conspired to hide unlawful kickback arrangements from the New York Department of Insurance in an effort to artificially inflate the amounts New Yorkers pay for title insurance.

2.      Title insurance rates may be collectively set by a rate setting organization comprised of the state's title insurers.  Defendants (along with other title insurers) formed Title Insurance Rate Service Association, Inc. ("TIRSA") in 1991.  TIRSA collects from defendants and its other title insurer members financial information and submits this information in aggregate form along with its rates to the New York Insurance Department ("Insurance Department").  Under this system, defendants have charged their collectively fixed rates to consumers since TIRSA was founded.

3.      Defendants have made it impossible for the Insurance Department to regulate the rates being imposed because the rates are principally based on costs over which the Insurance Department has neither the regulatory authority nor the ability to assess.  These costs are referred to as "agency commissions" in the industry.  These costs chiefly cover kickbacks and other costs paid in violation of N.Y. Ins. Law § 6409(d) that are unrelated to the issuance of title insurance.  By their scheme and conspiracy in restraint of trade.  Defendants hid the true nature of these agency commissions from the Insurance Department in an effort to inflate their overall revenues.  The Insurance Department does not have jurisdiction over title agents.

4.      Although the Insurance Department authorizes collective rate setting activity generally, the Defendants have acted collusively through TIRSA to thwart this oversight.  By

embedding these supposed costs within the agency commissions paid to unregulated title agents, Defendants have thwarted regulatory review by the Insurance Department. As these payments account for approximately 85 percent of the total costs that comprise TIRSA's rate submission, defendants have collusively inflated their rates and have prevented the Insurance Department from doing anything to regulate it or otherwise detect their conduct.

5.    Through this anticompetitive behavior, Defendants have successfully fixed and maintained their title insurance rates in New York at supracompetitive levels. These rates – which often are several thousand dollars – bear no relationship to the actual costs of indemnity risk.

6.    With respect to title insurance secured in connection with federally related mortgage loans, the kickbacks Defendants paid to title agents in the form of agent commissions that were not for services actually performed are illegal charges under the Real Estate Settlement Practices Act of 1974.

7.    Plaintiffs, on behalf of themselves and a class of all similarly situated New York title insurance purchasers, brings this action (1) under Section 1 of the Sherman Act to enjoin defendants' illegal behavior and recover treble damages and costs of this suit as a result for the illegal overcharges Plaintiffs and the Class have paid, and (2) under the Real Estate Settlement Procedures Act of 1974, 12 U.S.C. § 2607(b) to recoup the fees paid to title agents that were not "for services actually performed."

## JURISDICTION AND VENUE

8.    Plaintiffs bring this action to prevent and restrain violations of Section 1 of the Sherman Act, 15 U.S.C. § 1. This Court has subject matter jurisdiction under 28 U.S.C. §§ 1337(a) and 1331.

9.      Venue is proper in this judicial district under 15 U.S.C. § 22 because defendants are corporations that transact business in this District.

10.     The violations of antitrust law and RESPA alleged herein have substantially affected interstate commerce. Defendants sell title insurance throughout the United States collecting billions dollars in premiums annually.

## THE PARTIES

### A.    Plaintiffs

11.     Gary Kromer and Monique Kromer (the "Kromers") are natural persons residing in Wantaugh, New York. On December 6, 2007, the Kromers purchased title insurance from defendant Fidelity National Finance, Inc. ("Fidelity National") in connection with their purchase of a property located in Wantaugh, New York. The Kromers paid $1,771.00 for the insurance.

12.     Joseph Ammirati and Michelle Ammirati (the "Ammiratis") are natural persons residing in Huntington, New York. On December 10, 2007, the Ammiratis purchased title insurance from defendant First American Title Insurance Company of New York ("First American Title") in connection with their purchase of a property located in Huntington, New York. The Ammiratis paid $2,929.00 for the insurance.

### B.    Defendants

13.     Defendant Chicago Title Insurance Company ("Chicago Title") and Ticor Title Insurance Company ("Ticor Title"), are associated title insurance companies referred to as the Fidelity family of title insurance companies (collectively, "Fidelity Title"). Fidelity is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. Fidelity Title, Chicago Title, and Ticor Title were founding members of Defendant TIRSA and since TIRSA's inception have charged title insurance rates in

New York that TIRSA collectively sets. Fidelity Title, Chicago Title, Ticor Title and their affiliates are wholly-owned and controlled by defendant Fidelity National Finance, Inc. ("Fidelity National"), a Delaware corporation headquartered in Jacksonville, Florida. Fidelity Title engaged in the conduct challenged herein with the knowledge and approval of Fidelity National.

14.    Defendant First American Title and Defendant United General Title Insurance Company ("United General Title"), are associated title insurance companies referred to as the First American Family of title insurance companies (collectively "First American"). First American is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York. First American Title, United General Title, and their affiliates are wholly-owned and controlled by defendant First American Corporation ("FAC"), a California corporation headquartered in Santa Ana, California. Through its subsidiaries, FAC is a provider of title insurance, business information, and related products and services. First American engaged in the conduct challenged herein with the knowledge and approval of FAC.

15.    Defendant Commonwealth Land Title Insurance Company ("Commonwealth") and Defendant Lawyers Title Insurance Corporation ("Lawyers Title") are associated title insurance companies referred to as the LandAmerica family of title insurance companies (collectively, "LandAmerica"). LandAmerica is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York.

16.    Commonwealth and Lawyers Title are wholly-owned and controlled by defendant LandAmerica Financial Group, Inc. ("LAFG"), a Virginia corporation. LandAmerica engaged in the conduct challenged herein with the knowledge and approval of LAFG.

17.    Defendant Stewart Title Insurance Company ("Stewart Title") and Defendant Monroe Title Insurance Corporation ("Monroe Title") are associated title insurance companies referred to as the Stewart family of title insurance companies (collectively, "Stewart"). Stewart is engaged in selling title insurance to purchasers of commercial and residential real estate throughout the United States, including New York.

18.    Stewart Title and Monroe Title are wholly-owned and controlled by defendant Stewart Information Services Corporation ("SISC"), a Delaware corporation headquartered in Houston, Texas. Stewart engaged in the conduct challenged herein with the knowledge and approval of SISC.

19.    Defendant TIRSA is an association of title insurers licensed by the Superintendent of Insurance of the State of New York as a rate service organization. TIRSA maintains its offices this District in New York City.

20.    TIRSA annually compiles statistical data from its member relating to their title insurance premiums, losses and expenses and submits this information in aggregate form to the New York Insurance Department. TIRSA's membership is comprised of defendant insurers and all other title insurers that are licensed to issue policies in New York. TIRSA also prepares and submits the New York Title Insurance Rate Manual which sets forth title rates to be charged and rules to be followed by TIRSA's members.

21.    Defendants Chicago Title, Ticor Title Fidelity Title, Fidelity National, United General Title,  First American, FAC, Commonwealth, Lawyers Title, LandAmerica, LAFG, Stewart Title, Monroe Title, Stewart, SISC, and TIRSA are collectively refereed to herein as "Defendants."

## BACKGROUND

A.    **Title Insurance In New York**

22.    Title insurance is one of the most costly items associated with the closing of a real estate transaction. In New York, TIRSA's collectively fixed rates for title insurance are based on a percentage of the total value of the property being insured. For residential properties, this price ranges from about $1,800 to $3,700. For more expensive homes and commercial properties, these prices are significantly higher and can reach the tens of thousands of dollars. In 2006, the 27 title insurers licensed in the State of New York charged approximately $1.2 billion on premiums to insure New York homes.

23.    In New York, title insurance is required by residential and commercial real estate lenders. Title insurance protects the real estate purchaser and, in turn, the lenders from any unidentified defects in the title that would in any way interfere with the full and complete ownership and use of the property and with the ultimate right to resell the property.

24.    Title insurers get business by encouraging those making the purchasing decisions -- the lawyers, brokers, lenders -- to direct business to that insurer. The best way to incentivize these third-party representatives is not through lower prices (that they are not even paying), but through other financial inducements. Hence, it is through higher pricing, not lower pricing, that provides the optional method for title insurers to compete for business.

25.    This perverse form of competition, coupled with the particular vulnerability of most title insurance consumers, is the reason why most states regulate the industry. However, New York is only one of a very small number of states in which the leading title insurers collective fix their prices through a rate-setting organization like TIRSA. New York also may be

the only state in which these rates include "agency commissions" that are neither authorized nor regulated.

26.     There are two principal cost components that go into TIRSA's rate calculation. One is the cost of insuring the risk associated with issuing the title policy. The other is "agency commissions" paid to title agents.

27.     The underwriting portion of the rate covers the risk the title insurer bears for any undiscovered clouds on the title to property. Unlike conventional insurance products, title insurance carries a very limited risk of loss to the insurer. This is because title insurance protects against *prior* events that cause defects to title. If a proper search and examination of ownership records is performed, these defects are commonly uncovered and any such defects are almost always excluded from the policy's coverage. Consequently, the average claim payout on a title insurance policies is extremely low - nearly 5 percent of the total premium collected. This claim payout rate is much lower than property and casualty coverage (such as auto and home insurance) -- which protects against *future* losses are which an insurer cannot control. In these situations the average claim payout amounts to approximately 80 percent of the total premium.

28.     The "agency commissions" component of the title insurance rate covers payments made to title agents. Defendants have an ownership or management interest in many of the title agencies to which these payments are made. A small portion of these payments is for the search and exam of prior ownership records of the property being purchased to identify any liens, encumbrances, burdens, exclusions, or other defects in the title. The search and exam function does not involve the spreading or underwriting of risk and title insurers typically outsource this task to title agents.

29.    The remainder, and majority, of the agency commissions are comprised of costs unrelated to the issuance of title insurance. These costs include kickbacks and other illegal financial inducements title insurers provide to title agents and indirectly to the lawyers, brokers, and lenders who decide which title insurer to select. These payments have nothing to do with the business of title insurance and are made by title insurers solely to inflate their revenues.

30.    Under TIRSA's collective rate setting regime, roughly 85 percent of the total title insurance premium is based on the often illegitimate costs associated with the payment of agency commissions. Only approximately 15 percent is based on costs associated with the risk of loss. Of this 15 percent, title insurance companies only pay out approximately 3% in claims for all of their policies. The remaining 12 percent is pure revenue to the insurers.

31.    TIRSA publishes its final calculated title rates in the New York Title Insurance Rate Manual. These rates are tied to the value of the property being insured. This is so notwithstanding that the costs associated with agency commissions are unrelated to the value of the property. Indeed, agency kickbacks and enticements have little to do with the costs of securing a particular title policy and result in no value to the property owner. Instead the costs fluctuate based solely on the age of the property, the complexity of the ownership history, and the accessibility of prior ownership records.

**B.    TIRSA's Formation**

32.    Prior to TIRSA, the New York Board of Title Underwriters ("NYBTU") served as the title insurance rate-setting body in New York. NYBTU, along with the title insurance rate setting bureaus in many other states, was disbanded in the mid-1980s in the wake of a Federal Trade Commission ("FTC") challenge to the collective rate setting activity of many of these associations. The FTC challenge resulted in *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621 (1992),

where the Supreme Court held that to avoid *per se* illegal price fixing liability, the rate setting activity of these rating bureaus must be actively supervised by the state.

33.     In *Ticor*, the FTC focused its challenge on agency commissions. The FTC contended that the respective state insurance departments merely rubber-stamped this portion of the collectively fixed rates without any independent review or analysis of their reasonableness or cost justification. The Supreme Court concluded that to avoid illegal price-fixing liability, the state insurance department has to "exercise[] sufficient independent judgment and control so that the details of the rates or prices have been established as a product of deliberate state intervention, not simply by agreement among private parties." *Ticor*, 504 U.S. at 634-35.

34.     Defendants formulated TIRSA's first rate manual and procedure soon after the Supreme Court's *Ticor* decision. Through TIRSA, Defendants have set up a rate-setting scheme to circumvent the rigors of state oversight required by *Ticor*. They have done so by computing a single rate that includes both risk and agency commission costs and by outsourcing agency commission costs to title agents. As a result, Defendants are able to avoid providing the Insurance Department with any justification for the costs that make up their collectively fixed rates.

35.     TIRSA submits an aggregate figure that is supposed to represent the total agency commission costs. Embedded within this figure is the large quantity of dollars that are funneled to and through the title agencies as kickbacks, financial inducements and other costs unrelated to the issuance of title insurance. Defendants effectively "hide" the cost basis for their artificially high and collectively fixed title insurance premiums from the regulatory scrutiny that *Ticor* demands.

36.     The Insurance Law does not permit TIRSA to include unlawful remuneration and other agency commission payments that do not relate to the title insurance rate setting process in its rate submissions.  The Insurance Department has acknowledged that it lacks the authority to review any such payments and has discovered that Defendants' submission of these agency commission costs has prevented it from performing a meaningful review of TIRSA's calculated rates.  During a November 3, 2006 public hearing, the Insurance Department criticized TIRSA, and its members, on TIRSA's failure to provide the Insurance Department with any backup or detail for agency commissions.

37.     During this questioning, David Sidikman, the Executive Director of TIRSA admitted that TIRSA does not know what the agency commission costs it submits to the Insurance Department actually cover:

> **Q.**     . . . you've also testified that your members really don't know what the title agents are doing with the money that they're getting, in other words, they give them 85 percent and as far as they know they have no input or no knowledge of what's being done with the money, I just want to make sure, is that correct?
>
> **A.**     I have no way of knowing . . . what [the title agents'] expenses are, what their overheads are, what they pay in salaries, what they pay in administrative costs, what they pay in rent and what they pay with every other aspect of their overhead, I have no way of knowing that.  (*David Sidikman)*
>
> \*   \*   \*
>
> **Q.**     . . . a large portion of the data represents revenue and expenses that are outside the control of the [insurer] and outside of the control of TIRSA and you have no specific knowledge as to how those dollars are being expended, as you just said?
>
> **A.**     That's correct.

38.     Mr. Sidikman further testified that TIRSA does not know the actual search and exam costs incurred by title agents on behalf of the TIRSA's members:

> **Q.**    What are the actual costs to title insurers to the agents to do the necessary searches and all the other things that they need to do in connection with a title search?
>
> **A.**    We do not get the agents' statistics because that is between the [insurer] and the agent.

39.    From this and other testimony at the hearing, the Insurance Department conceded that it could not properly evaluate TIRSA's calculated rates, and that it could only do so if it obtained the detailed cost information on agency commissions that TIRSA does not provide.

40.    The Insurance Department's recognition that it is not properly supervising TIRSA's rate-setting activity is consistent with the April 2007 findings of the U.S. Government Accountability Office ("GAO") that the title insurance industry is in need of greater state regulation. The GAO studied the industry conditions of several states, including New York, and concluded that "state regulators have not collected the type of data, *primarily on title agents' costs and operations*, needed to analyze premium prices and underlying costs." (emphasis added).

41.    Bespeaking the lack of regulation and oversight, legislation has recently been introduced to fill the regulatory void that currently exists with regard to the title agency costs.

42.    The recent proposal of new legislation regulating title agents, and reviewing their agency commissions, highlights the fact that the Insurance Department currently has neither the authority nor the ability to properly assess Defendants' collectively fixed rates.

**C.    Defendants' Inflated Rates and Excess Profits**

43.    At the time of TIRSA's formation, the Insurance Department set limits in the industry of 5 percent as the profit margin for title insurers. Through their anticompetitive

behavior, Defendants have vastly exceeded this limitation, because the Insurance Department has been unable to perform its oversight function.

## INTERSTATE COMMERCE

44.    At all times relevant hereto, Defendants and each of them conducted business across state lines in interstate commerce.

## ANTICOMPETITIVE CONDUCT

45.    Defendants are competitors in the sale of title insurance to consumers in New York. Through TIRSA, these title insurers have agreed and engaged in concerted efforts to (i) collectively set and charge uniform and supracompetitive rates for title insurance in New York, (ii) include in their calculated rates agency commission costs, (iii) embedded within these costs payoffs, kickbacks, and other charges that are unrelated to the issuance of title insurance, and (iv) hide these supposed "costs" from regulatory scrutiny by funneling them to and through title agents over which the Insurance Department has no ability or authority to regulate.

46.    Defendants' conduct constitutes a horizontal agreement to fix the form, structure, and prices of title insurance in New York and is a *per se* violation of Section 1 of the Sherman Act.

47.    Defendants' price-fixing activity has been continuous throughout the relevant damages period and has been renewed and reinforced annually through TIRSA' submissions to the Insurance Department of supposed cost and revenue information and its periodic submissions of rate changes

48.    Throughout the relevant period, the market for title insurance in New York is an oligopoly. For example, in 2006, just four Defendants (Fidelity Title, First American, Land America and Stewart) collectively maintained a 92% market share in New York.

49.    Through their collective price-fixing and manipulation of the regulatory process, Defendants have harmed competition by charging consumers supracompetitive prices for title insurance in New York.

50.    Absent Defendants' illegal conduct, title purchasers in New York would have paid significantly less for title insurance and were therefore damaged as a result.

## PAYMENT OF AGENCY COMMISSIONS FOR SERVICES NOT ACTUALLY PERFORMED

50.    As alleged herein, Defendants pay title agents commissions which have no relationship to the services that these agents perform in securing title insurance.  In fact, the majority of costs identified by Defendants in their rate-setting submissions are actually illegal remuneration for referrals or other payments which have nothing to do with services performed by the title agent.

51.    The kickbacks paid by the title insurers to the title agents are not disclosed as settlement fees on borrowers' HUD-1 settlement statements.

## CLASS ACTION ALLEGATIONS

51.    Plaintiffs bring this action as a class action under Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiffs seek to certify two classes:  (1) a class is comprised of purchasers of title insurance in New York from Defendants or TIRSA's other members during the period 1991 through the present ("the Antitrust Class") and (2) a class comprised of purchasers of title insurance in New York who secured such insurance in connection with a closing on a "federally related mortgage loan" as that term is defined in 12 U.S.C. § 2602(1) (the "RESPA Class").

52.    Plaintiffs and all other members of the Antitrust Class were injured in a similar way - they each paid supracompetitive prices for title insurance in New York.

53.     Plaintiffs and all other members of the RESPA Class were injured in a similar way – they each paid fees for services which were either "other than for services actually performed" or were for "unearned fees" as those terms are defined in 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

55.     Members of both the Antitrust Class and the RESPA Class are so numerous that their joinder would be impracticable.   Hundreds of thousands, if not millions, of consumers paid title insurance premiums to insure property located in New York from 1991 to the present.

54.     Common questions of law and fact exist with respect to all members of the Antitrust Class and predominate over any questions solely affecting individual Class members. Among the questions of law or fact common to the class are the following:

- Whether Defendants have engaged in any alleged illegal price-fixing activity;

- The duration and scope of Defendants' alleged illegal price-fixing activity;

- Whether Defendants' alleged illegal price-fixing has caused higher prices to Plaintiffs and other purchasers of title insurance in New York; and

- Whether the Insurance Department exercised, and had the ability to exercise, adequate controls over the industry's cost estimate.

55.     Common questions of law and fact exist with respect to all members of the RESPA Class and predominate over any questions solely affecting individual RESPA Class members.  Among the questions of law or fact common to the class are the following:

- Whether Defendants have provided a "settlement service" as that phrase is defined in 12 U.S.C. § 2602(3) and applicable regulations promulgated thereunder;

- Whether Defendants have charged for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed" or have collected "unearned fees"; and

- The nature and scope of the unearned fees charged by the Defendants for kickbacks to title agents.

58.    Plaintiffs' claims are typical of those of all members of the Antitrust Class and the RESPA Class.  Plaintiffs, like all other members of the Antitrust Class, paid the supracompetitive premiums referenced herein.  Further, Plaintiffs, like all other members of the RESPA Class, paid fees in connection with a federally related mortgage loan for charges other than for services actually performed.

56.    Plaintiffs and their counsel are adequate representatives of the Antitrust Class and the RESPA Class.  Plaintiffs' interests are perfectly aligned with the class they seek to represent and will fairly and adequately represent the interests of that Class.  Plaintiffs' counsel is experienced in class action, antitrust and RESPA litigation and is adequate to represent the Class.

57.    This action is superior to any other method for the fair and efficient adjudication of this legal dispute since joinder of all members is not only impracticable, but impossible.  The damages suffered by certain members of the Antitrust Class and the RESPA Class are small in relation to the expense and burden of individual litigation and therefore it is highly impracticable for such members of the classes to seek redress for damages resulting from Defendants' anticompetitive conduct.

58.    Defendants have acted, continued to act, refused to act and continued to refuse to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief with respect to the Antitrust Class and RESPA Class as a whole.

## FRAUDULENT CONCEALMENT AND EQUITABLE TOLLING

59.    Defendants have engaged in fraudulent, misleading and deceptive efforts to conceal the true nature of their unlawful conduct from Plaintiffs and the classes.  Defendants

have intended to and have in fact accomplished their concealment through misrepresentations and omissions, as described herein.

60.    Included among that deception is Defendants' practice of submitting, through TIRSA, aggregate cost statements which do not identify the manner or amount of their illegal agency commissions. By failing to identify these costs, Defendants complied their data in a manner that did not reasonably alert Class members that Defendants were collectively imposing illegal fees on Plaintiffs and the Class.

61.    Due to Defendants' fraudulent concealment and because Defendants represent that the unlawful rates are legitimately charged and collected, Plaintiffs have only recently learned of the existence of her claims against Defendants. For the same reasons, many Class members are likely to be reasonably unaware of Defendants' unlawful acts.

62.    Plaintiffs' and the Class' lack of knowledge as to their claims against Defendants is and was not due to any fault or lack of diligence on their part, but rather due entirely or substantially to the acts of Defendants designed to conceal and hide the true nature of their unlawful and inequitable conduct.

## FIRST CLAIM FOR RELIEF

### -- Against all Defendants --

### (Sherman Act Section I - *Per Se* Unlawful Horizontal Price-Fixing)

63.    Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

64.    Defendants operate their businesses in interstate commerce.

65.     Defendants have entered into a continuing illegal contract, combination, or conspiracy in restraint of trade, the purpose and effect of which is to fix and maintain supracompetitive prices to consumers for title insurance in New York.

66.     Defendants' contract, combination, or conspiracy involves Defendants' efforts and agreement to (i) collectively fix uniform and supracompetitive rates for title insurance in New York; (ii) include in their calculated rates agency commission costs, (iii) embed within these costs payoffs, kickbacks, and other charges to title agents that are unrelated to the issuance of title insurance, and (iv) hide these supposed costs from regulatory scrutiny by funneling them to and through title agents.

67.     Defendants' contract combination or conspiracy has caused substantial anticompetitive effects in the title insurance market.  It has done so by causing Plaintiffs and the absent members of the class to pay significantly more for title insurance than they would have in the absence of Defendants' illegal activity.

68.     As a result of these violations of Section 1 of the Sherman Act, Plaintiffs and the class members of Antitrust Class have been injured in their business and property in an amount not presently known, but which is, at a minimum, hundreds of millions of dollars, prior to trebling.

69.     Such violations and the effects thereof are continuing and will continue unless the Court enjoins Defendants from continuing their conspiracy in restraint of trade.

## SECOND CLAIM FOR RELIEF

### -- Against all Defendants --

### (RESPA - Payment of Undisclosed Fees For Services Not Rendered)

73.     Plaintiffs repeat and reallege each and every allegation of this complaint as if fully set forth herein.

74.     Plaintiffs and each class member of the RESPA Class are "person[s]" as that term is defined in 12 U.S.C. § 2602(5).

75.     Plaintiffs and each class member of the RESPA Class paid title insurance premiums in connection with their closing on "federally related mortgage loans" as that term is defined in 12 U.S.C. § 2602(1).

76.     Defendants provided "settlement services" to Plaintiffs and each member of the RESPA Class as that phrase is defined in 12 U.S.C. § 2602(3) and applicable regulations promulgated thereunder.

77.     Section 2607(b) of Title 12 of the United States Code states, in pertinent part, that "no person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed." 24 C.F.R. § 3500.14(c) construes 12 U.S.C. § 2607(b) to also prohibit the charging and collecting of an "unearned fee."

78.     As alleged herein, Defendants imposed fees on Plaintiffs and the members of the RESPA Class for unearned settlement services and settlement services not provided which are prohibited by RESPA and other federal laws and regulations. The vast majority of the agency

commissions identified herein which were *sub silentio* imposed by Defendants were in excess of the reasonable value of services provided.

79.     Defendants' acts, practices and conduct constitute *per se* violations of RESPA. Alternatively, even if not *per se* violations, Defendants' acts, practices and conduct violated RESPA.

80.     Plaintiffs and each class member of the RESPA Class has been injured as a result of Defendants' violations of 12 U.S.C. §§ 2607 and 2610.

81.     Plaintiffs and each class member of the RESPA Class is entitled to pursue an action and a class action against Defendants pursuant to 12 U.S.C. §§ 2607(d) and 2610 to redress Defendants' violations of RESPA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs and the absent members of the Class pray for the following relief:

A.     That this Court declare, adjudge, and decree that Defendants have violated the Sherman Act and RESPA;

B.     That Defendants, their directors, officers, employees, agents, successors, and assigns be permanently enjoined and restrained from, unlawfully fixing or maintaining their title insurance rates at supracompetitive levels, and committing any other violations of Section 1 of the Sherman Act and RESPA;

C.     That this Court award treble damages sustained by Plaintiffs and the absent members of the Antitrust Class as a result of Defendants' violation of Section 1 of the Sherman Act, plus interest (including prejudgment interest), to compensate them for the overcharges they incurred;

D.     That the Court award Plaintiffs and the absent members of the Class the Antitrust Class attorneys' fees and costs of suit;

E.     That the Court award Plaintiffs and the absent members of the RESPA Class "three times the amount of any charge paid" for the unearned settlement services referenced herein, plus attorneys' fees and costs. 12 U.S.C. § 2607(d); and

E.     That this Court award all such other and further relief as it may deem just and proper.

### **DEMAND FOR JURY TRIAL**

Plaintiffs demand a trial by jury of all issues triable by jury.

Dated: February 13, 2008

LOWEY DANNENBERG COHEN & HART, P.C.

_____
Richard W. Cohen, (RC-5220)
Barbara Hart (BH-3231)
Peter D. St. Phillip, Jr. (PS-0726)
Scott V. Papp (SP-6005)
One North Broadway - Suite 509
White Plains, NY  10601-2310
Telephone:  (914) 997-0500
Telecopier:  (914) 997-0035

BERMAN DeVALERIO PEASE TABACCO
        BURT & PUCILLO
Joseph J. Tobacco, Jr.
Todd A. Seaver
425 California Street, Suite 2100
San Francisco, CA 94104
Phone: (415) 433-3200
Fax: (415) 433-6382

*Counsel for Plaintiffs*